# Supreme Court of Florida

---

No. SC2023-0320

---

**MARK H. WILSON,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

May 22, 2025

PER CURIAM.

Mark Howard Wilson appeals his convictions and sentences of death for the first-degree murders of his girlfriend's young nephews in 2020. We have jurisdiction. *See* art. V, § 3(b)(1), Fla. Const. For the reasons explained, we affirm.

## I. BACKGROUND

On August 26, 2020, Sarah Baker awoke to find her sons, twelve-year-old Robert and fourteen-year-old Tayten, brutally murdered in her home. Their heads were beaten with a hammer and their throats cut. Appellant Mark Wilson was the boyfriend of

Sarah's sister, Cynthia Guinan (Cindy). Five days before the murders, Wilson, Cindy, and their fourteen-month-old daughter, K.W., moved into a shed on the Bakers' property at Sarah's insistence, after Sarah learned that their rental was infested with fleas and had no power, and they had no food and were smoking marijuana in the house with K.W. present.

Wilson, Cindy, and K.W. moved to the Bakers' property on August 21, 2020. Sarah lived there with her husband, Chad, the victims, and her other son, who was four years old at the time. The shed did not have a working bathroom, so Wilson had access to the Bakers' house to use the bathroom and kitchen, and to do laundry.

Sarah said that nothing was out of the ordinary on August 25, 2020, which was the day before the murders. Cindy had a doctor's appointment scheduled for the morning of the 26th to confirm a positive home pregnancy test, and Sarah gave her and Wilson ten dollars for gas to get to the appointment. That night, Tayten slept in the "pool table room" and Robert slept in the living room. Around 2 or 3 a.m. on the morning of August 26, Sarah saw Wilson when she went outside to smoke. Wilson was on the porch

sharpening his knife and was acting normal and did not seem impaired. Sarah went to bed soon after.

When Sarah woke later that morning, she saw blood on the floor as she entered the pool table room. When she removed Tayten's blanket, she saw that he was covered in blood. His throat appeared to be severed to the bone, and he had no pulse. Tayten borrowed Sarah's phone the previous night, and she could not find it so she ran to Cindy and Wilson's door but they were not there. Sarah then ran back to the house, screaming at Robert to call 911, but when she removed Robert's blanket, she saw that he too was covered in blood. Sarah then drove to her father's house on the next street to call for help.

Investigators found a hammer and a fillet knife under a sink in another detached building on the property. Both appeared to have blood on them and were wrapped in placemats. Blood-soaked paper towels were found in the trash outside. A note that was handwritten by Wilson was also found. The note read:

> Honey, if I could find words for what you do to make me completely whole, I would. I get so frustrated, baby, cause most of the time I come off as angry or confrontational, but you have to understand that you [sic] and [K.W.] by my side, I am way more than ordinary.

I can't even try to imagine life without you and her. I can't lose you two. [K.W.] is so extraordinary. She really is our greatest achievement. Please promise me that she will always know that her dada is a soldier and that he loved you from day one and will always love you both until the end of time.

Wilson returned to the Baker home after Cindy's doctor appointment. He was informed about the murders and gave three brief interviews to Putnam County Sheriff's Detective Jacob Higginbotham at the scene. In all three of these interactions, Wilson was responsive and did not appear to be impaired in any way.

The day after the murders, Wilson's mother, Chrisy Adkins, told Wilson that he needed to cooperate with law enforcement and take a polygraph to clear his name. Wilson said he could not do that. Adkins asked him, "[D]id you hurt those babies?" to which Wilson responded, "Yes, Mom, I did it." Shortly after the confession, Adkins drove to the sheriff's office and informed law enforcement that she believed Wilson was responsible for the murders. She agreed to have another conversation with Wilson about the murders while wearing a wire.

The recorded conversation between Adkins and Wilson took place in Adkins's car. Wilson said that he and Cindy had made a plan in which he would kill Robert and Tayten and Cindy would kill Sarah and Sarah's four-year-old son. After hearing Wilson's admissions on the wire, law enforcement conducted a traffic stop on the vehicle and arrested Wilson. Wilson was transported to the sheriff's office and agreed to speak with law enforcement and to provide a DNA sample.

Wilson began by detailing what he and Cindy did on the morning of August 26, which included trips to Cindy's parents' home, a convenience store, the doctor's office, and their prior residence to feed his dog. Wilson could recall in detail all the specific roads he and Cindy traveled when making those stops. Wilson also described having sex with Cindy early that morning, and he recalled the medication she took for an upset stomach.

Wilson initially denied involvement in the murders, but after learning about the recorded conversation with his mother and being told that Cindy had implicated him and revealed their murderous plan, he admitted using his hammer to hit each of the boys multiple times and cutting their throats with a fillet knife. He claimed to

believe that the boys were physically and sexually abusing K.W. and said the boys were probably having sex with Cindy too, although he later backtracked on that allegation.[1] Wilson also said that he thought Cindy was covering up the boys' sexual abuse of K.W. Wilson agreed that his motive for killing the boys was "pretty much" because he felt like they were abusing and hurting Cindy and K.W. He also said that Cindy was messing with his head and that she indirectly told him to kill the boys. Wilson said that he and Cindy were using methamphetamine on the day of the murders and that he had been awake for two to three days.

Wilson said the murders occurred in the morning on August 26 after he and Cindy returned from picking up coffee around 7:00 a.m. but before they left for the doctor appointment at 9:00 a.m. He said Cindy was right outside while he was in the house killing the boys and that she saw them after they were dead. Both boys were sleeping when Wilson began the attack. Wilson claimed that he blacked out during the attack, that his memory was "foggy," and

---

1. Law enforcement investigated the allegations regarding the boys and Cindy and K.W. and found no evidence to support them.

that he recalled "bits and pieces." Wilson admitted to being "cold and emotionless"—as opposed to upset or in a rage—while he was committing the murders.

FDLE tested evidence for fingerprints, DNA, and blood. A bloody handprint found on the wall near Tayten's body was identified as Tayten's. Tayten's blood and DNA were on Wilson's hammer. DNA matching both Tayten and Robert was found on Wilson's fillet knife. The blood-stained, black, hooded sweatshirt Wilson was wearing on the morning of the murders contained the DNA of Robert, Tayten, and Wilson.

Predrag Bulic, M.D.,[2] conducted the autopsies on both boys. In short, the cause of death for both was sharp force injuries to the neck and blunt force trauma to the head. Dr. Bulic determined the blunt force trauma was caused by a hammer.

In detail, Robert had a large, incised wound to his neck, which transected both the carotid arteries and jugular veins on both sides of his neck as well as his larynx and the large muscles supporting

---

2. Dr. Bulic passed away before the trial so the chief medical examiner for the district, James Fulcher, M.D., testified about the autopsies at trial.

the head.  There were three smaller incised wounds to the neck. The large wound started at the front of the neck and extended all the way to the spine.  A mark was found on the third cervical vertebrae, indicating the knife had struck the vertebrae.  The "satellite wounds" to the large wound suggested that a sawing motion was used to achieve the depth of the primary wound.  The wound suggested as many as six different entries by the knife in the process of the cutting.  There was a wound to the left side of the jaw, which appeared to have been caused by the inserting and twisting of a knife.

Robert also had numerous impact injuries to his skull.  These included blunt force trauma and a more severe wound, a depressed skull fracture, corresponding to the blunt trauma on the right side of his head.  The medical examiner opined that the depressed skull fracture would have resulted in loss of consciousness due to injury to the brain.  There were other skull wounds with bone fragments pushed inward, consistent with being inflicted by the round face of a hammer.  The major loss of blood suggested that Robert was alive when the neck injuries were inflicted.  But the evidence overall indicated that the head injuries were inflicted first, likely resulting

in unconsciousness, and the neck injuries followed while Robert was still alive, but likely unconscious.

Tayten suffered similar injuries to his head and neck. His neck was cut as many as twelve times, likely in a sawing motion. These wounds transected the right carotid artery and jugular vein. There was a mark on Tayten's third cervical vertebrae consistent with a knife striking the vertebrae. The medical examiner opined that after this wound and the resulting blood loss, Tayten likely would have lost consciousness within thirty seconds. Tayten suffered twenty stab wounds. He had an incised wound on one of his fingers, which appeared to be a defensive wound.

Tayten also suffered multiple blunt force injuries to his head. There was trauma to his lip, which was likely caused by his face being forced against the ground, while the back of his head was struck. He was found face down on the floor. Two of the blunt force wounds to the back of Tayten's head displayed a curvilinear shape consistent with a hammer. At least one of the wounds displayed a clean "punched out" shape of skull consistent with the shape of a hammer head. The two wounds to the occipital scalp resulted in depressed skull fractures that would have resulted in

unconsciousness and could have resulted in death due to brain swelling. There were at least seven blows to Tayten's head.

The medical examiner reviewed the photographs of the blood trail in the pool table room, which extended around the table to where Tayten's body was found. On the wall near Tayten's body there was a bloody handprint, determined to be Tayten's, which suggested that Tayten had been alive when the print was placed. The evidence strongly suggested that the attack on Tayten commenced with knife wounds inflicted at the end of the pool table and completed with the hammer wounds near the other end of the table where the handprint was found.

Wilson was convicted of two counts of first-degree murder, burglary with assault or battery, and burglary of a dwelling while armed.[3]

---

3. The jury was instructed in accordance with section 810.02(1)(b)2.c., Florida Statutes (2020), that the burglary counts required the State to prove that (1) Wilson had permission or consent to enter a structure owned by or in the possession of Chad and/or Sarah Baker; and (2) after entering the structure, Wilson remained therein with the intent to commit or attempt to commit a forcible felony, namely, aggravated assault, aggravated battery, manslaughter, second-degree murder, or first-degree premeditated murder.

At the penalty phase, the State presented victim impact statements from the victims' family members and a friend. The State relied on the trial testimony to establish the proposed aggravating factors. Wilson called several family members and seven expert witnesses in support of his proposed mitigating circumstances. Wilson's experts included: Susan Skolly-Danziger, PharmD, who testified as an expert in toxicology, pharmacy, and pharmacology; an education mitigation expert; a neuroradiologist; an expert in corrections policies, practices, and procedures; an expert in neuropsychology; an expert in neurology and pediatric neurology; and an expert in psychology. The State called two experts in rebuttal: William Meadows, Ph.D., a consulting forensic psychologist; and a psychiatrist.

As to the murder of Robert Baker, the jury unanimously found that each of the three proposed aggravating factors—(1) the defendant was previously or contemporaneously convicted of another capital felony; (2) the capital felony was committed while the defendant was engaged in the commission of a burglary; and (3) the capital felony was committed in a cold, calculated, and

premeditated manner without any pretense of moral or legal justification (CCP)—was proven beyond a reasonable doubt.

As to the murder of Tayten Baker, the jury found that the same three aggravating factors were proven beyond a reasonable doubt plus a fourth: the capital felony was especially heinous, atrocious, or cruel.

The jury also unanimously found as to both murders: that the aggravating factors were sufficient to warrant a sentence of death; that at least one or more jurors found that one or more mitigating circumstances was established by the greater weight of the evidence; that the aggravating factors outweighed the mitigating circumstances; and that Wilson should be sentenced to death.

The trial court agreed with the jury that the three aggravating factors proposed as to Robert's murder and all four aggravating factors proposed as to Tayten's murder were proven beyond a reasonable doubt, and gave great weight to each aggravator. The trial court did not find any statutory mitigating circumstances established as to either murder.

As to the proposed other factors in Wilson's background that would mitigate against imposition of the death penalty under

section 921.141(7)(h), Florida Statutes (2022), the trial court found as follows: Wilson endured challenges directly related to his geographical address (slight weight); through education and employment, Wilson overcame, at least in part, the negative aspects of his traumatic childhood (slight weight); Wilson was sexually assaulted as a child in elementary school (slight weight); Wilson has exemplary courtroom behavior (moderate weight); Wilson has been a compliant and cooperative county jail inmate for years (slight weight); Wilson has the potential for rehabilitation (slight weight); notable Seventh Judicial Circuit first-degree murder convictions[4] (slight weight); Wilson has a mental health diagnosis of attention deficit disorder (slight weight); Wilson was abused by his adult caretakers as a child (slight weight); Wilson lacked parental guidance as a child (slight weight); Wilson suffered complex trauma during his childhood (little weight); Wilson experienced recurrent residential relocations and school changes as a child (slight weight); Wilson's psychological and emotional development was critically

4. The trial court interpreted this proposed mitigator as suggesting that it conduct a proportionality assessment across recent cases from the Seventh Judicial Circuit.

- 13 -

impacted because he was introduced to maladaptive behaviors at an early age by the adult caretakers in his life (slight weight); Wilson abused methamphetamine as an adult (slight weight); Wilson suffered from depression in childhood (slight weight); Wilson suffered from at least one traumatic brain injury (slight weight); Wilson maintains a relationship with his mother, sister, and aunt (little weight); twelve to zero death overrides to life sentence[5] (the court found this to be worthy of consideration and gave considerable reflection and deliberation on the ability of the court to exercise its discretion in favor of life).[6]

---

5. The gist of this proposed mitigator was that there is precedent for a judicial override of a death recommendation even in cases where the jury recommendation vote was 12-0.

6. There were also a number of proposed mitigating circumstances that were given no weight because the court found them to be duplicative or they were considered by the court as bearing on other circumstances rather than standalone circumstances. These included the following: a life sentence will provide the victims' family with closure; Wilson's mother was the victim of domestic violence when she was pregnant with him; Wilson witnessed multiple episodes of domestic violence throughout his childhood; Wilson's parents abused illegal substances during his youth; Wilson's stepparents introduced him to illegal substances during his youth; Wilson abused inhalants as a child; Wilson abused cocaine as a child, teenager, and a young adult; Wilson was raised in severe poverty; Wilson was repeatedly abandoned by his primary caretakers for days at a time; Wilson

The trial court ultimately followed the jury's recommendations and sentenced Wilson to death for each of the murders and to a consecutive life sentence for burglary while armed.[7] This appeal followed.

## II. ANALYSIS

### A. CCP

Wilson first argues that the trial court erred by allowing the

---

experienced chronic exposure to trauma during his childhood; Wilson had an immediate family member who was incarcerated during his childhood; Wilson had limited protective factors as a child; Wilson was unlawfully removed from his mother by his father at a very young age; Wilson has intelligence deficits; Wilson's maternal family has a history of mental illness; Wilson's paternal family has a history of mental illness; Wilson abused drugs and inhalants as a child, impacting his brain development; Wilson was sleep deprived at the time of the offenses; Wilson suffers from PTSD; Wilson suffered from depression as an adult; Wilson can be redeemed; Wilson can serve as an inmate worker if sentenced to life in prison without parole; Wilson took responsibility for the deaths of Tayten and Robert Baker within one day of the crime; Wilson suffers from generational family psychological dysfunction; Wilson suffers from mental illness; Wilson had abnormal brain imaging; Wilson has brain damage; Wilson suffers from deficits in executive function; Wilson has neurological deficits; and Wilson lives his life in flight or fight mode.

7. A nolle prosequi was entered as to the burglary with an assault or battery count after Wilson was sentenced on the remaining three counts.

jury to consider the CCP aggravator.  At the close of the guilt phase,

the jury was instructed:

> If you return a verdict of guilty to the charge of first-degree murder, it is not necessary that all of you agree the State proved first-degree premeditated murder, and it is not necessary that all of you agree the State proved first-degree felony murder.  Instead, what is required is that you[ ]all agree the State proved either first-degree premeditated murder or first-degree felony murder.

The verdict forms originally provided to the jury gave the following

three options for a verdict of guilty as to the first-degree murder

counts:

> ____GUILTY as charged of both First-Degree Premeditated Murder and First-Degree Felony Murder

> ____GUILTY as charged of only First-Degree Premeditated Murder

> ____GUILTY as charged of only First-Degree Felony Murder

Two hours into deliberations, the jury sent out a question

indicating confusion regarding an apparent discrepancy between

the instructions and the verdict forms.[8]  The jury listed the three

---

8.  Although the jury's question appeared to refer to the "verdict form" as a whole, the record does not indicate whether the question was relevant to one or both of the murder counts.  We will assume the question was relevant to both counts.

- 16 -

options provided on the verdict forms and asked, "But, [the i]nstructions state if [we find the defendant guilty of] 1st Degree [murder, it is] not necessary for all to agree on pre-med[itation.] So – if we are not unanimous as to pre-med[itation] – which line on the form do we use?"

Recognizing the error on the verdict forms that caused the confusion, the trial court amended the verdict forms to change the jury's first option regarding first-degree murder to say "guilty as charged of first-degree murder." The verdict forms were amended as to both Robert and Tayten's murder because it was unknown to which count the question pertained or whether it pertained to both counts.

After rereading the relevant instructions and providing the amended verdict forms, the jury was sent to continue deliberations at 6:31 p.m. At 6:36 p.m., the jury returned with verdicts of "guilty as charged of first-degree murder" on counts one and two. After the guilt phase verdicts, Wilson filed a motion to preclude instruction or argument on CCP in the penalty phase. In his motion, Wilson acknowledged that where a jury returns a general verdict of guilty of first-degree murder, the State may pursue the CCP aggravating

factor.  Even so, Wilson argued that the jury should not be instructed on CCP because

> [w]here the jury in the first phase of a capital trial cannot agree that premeditation has been proved beyond a reasonable doubt, as a practical matter that same jury— absent additional proof—will be unable to agree that the heightened premeditation required for the CCP aggravator has been proved beyond a reasonable doubt.

The motion was denied, and the jury found that the CCP aggravator was proven beyond a reasonable doubt as to both murders.  The trial court agreed.

As to the murder of Robert Baker, the court wrote:

> d) The Defendant's argument on this factor centers on a question from the jury at the close of the case on the merits.  Specifically, the Defendant attacks the heightened premeditation necessary to find this factor and cites to the jury's question.  The jury asked a question during deliberations that suggested that some of the jurors were considering finding premeditation as the basis for First-Degree murder, while others found felony murder as the basis.  In the merits phase, a jury may find an individual guilty of first-degree murder under a theory of either felony murder or premeditated murder.  No special verdict is required.  The merits jury here ultimately entered a general verdict which does not specify whether they found felony murder or premeditated murder.  Indeed, under existing Florida law, the jury may return a finding of guilty of first-degree murder even if they disagree as to whether premeditation or felony murder is proven.

- 18 -

e) The Court finds that in the penalty phase, the jury reflected on the evidence and concluded that the Defendant did indeed[] premeditate and plan this murder.  The Defendant's argument that they could not have found sufficient additional premeditation to sustain CCP is not founded.  The Court specifically notes that other than his own claims, there is no objective evidence demonstrating that the Defendant was impaired at or near the time of the offense.  No one who observed him reported or suggested that he was acting as if [he] were under the influence of substances.  The overall sequence of events argued by the State has been convincingly proven.  The Defendant's argument is that he had concluded the Baker boys presented a threat to him and his family.  The Court finds that he planned these homicides with precision, even, apparently taking the time to sharpen the fil[l]et knife in front of the boy[s'] mother the night before.  He took the time, in the middle of the murders, to change weapons to make sure the victims were dead.  Finally, the Court concludes there wasn't the slightest pretense of moral justification.  Robert was asleep and defenseless.  Tayten was awake, but brutally butchered as he sought to escape and perhaps call for help.  Neither of these boys did anything to the Defendant to justify this crime.  The [Court] finds this factor proven beyond and to the exclusion of a reasonable doubt and affords it GREAT WEIGHT.

(Citations omitted.)

And as to the murder of Tayten Baker, the court wrote:

The arguments on this factor are the same as for Robert Baker with one exception.  Tayten appears to have been awake and conscious for some part of the murder.  However, there is no evidence, other than the defensive wound on Tayten that might even suggest any action by Tayten which could even hint at a moral justification.  The Court finds there is no basis whatsoever to conclude

- 19 -

that Tayten did anything to provoke the murder. The wound to his hand was defensive. There is no evidence to conclude he did anything to provoke the attack. Therefore, the same conclusions apply on this factor. The jury found this factor proven beyond a reasonable doubt as to Tayten as well. The Court finds it proven beyond a reasonable doubt and for the same reasons affords it GREAT WEIGHT.

Wilson argues that the trial court erred in submitting the CCP aggravator to the jury "because minutes before the guilt-or-innocence verdict was announced, the jury foreman spontaneously indicated the jurors had not achieved unanimity as to premeditation." He also challenges the trial court's conclusion that the jury reflected on the matter during its penalty phase deliberations and concluded that premeditation was proved beyond a reasonable doubt.

"[T]his Court has held [that] '[t]he trial court must instruct the jury on any aggravators for which credible and competent evidence is presented.'" *Doty v. State*, 170 So. 3d 731, 739 (Fla. 2015) (third alteration in original) (quoting *Hall v. State*, 87 So. 3d 667, 671 (Fla. 2012)). In other words, there is no error when a trial court instructs on any aggravator for which credible and competent evidence is presented.

Here, the trial court properly instructed on CCP because there was credible and competent evidence to establish CCP as detailed in the sentencing order. For example, Wilson took the time to sharpen his fillet knife before the murders; he received no provocation from either boy, as both were either sleeping when the attack began or just before it, and everything had been normal at the house the day before; Wilson hit both boys on their heads with a hammer multiple times and stabbed, slashed, and/or sawed both of their necks multiple times; Wilson changed weapons during the murders to make sure the victims were dead; Wilson told law enforcement that he preplanned the murders; and there was no pretense of legal or moral justification for the killings, nor does Wilson argue that the murders were justified. *See, e.g.*, *Pham v. State*, 70 So. 3d 485, 499 (Fla. 2011) (concluding that legally sufficient evidence exists to support CCP where the defendant procures a murder weapon in advance, receives no resistance or provocation on the part of the victim, and carries out the killing as a matter of course); *Franklin v. State*, 965 So. 2d 79, 98 (Fla. 2007) ("In a number of cases, we have cited the defendant's procurement of a weapon in advance of the

crime as indicative of preparation and heightened premeditated design.").

Wilson's argument concerning the jury's question about the verdict form is predicated on a mischaracterization of the facts. His assertion that "the jury foreman spontaneously indicated the jurors had not achieved unanimity as to premeditation" is erroneous. The jury's question was purely hypothetical—"*if* we are not unanimous" (emphasis supplied). It did not suggest that any jurors had reached any conclusion on premeditation. Even assuming that when the question was posed, the jury was not unanimous on premeditation, a lack of unanimity on one or both counts at sometime during the guilt phase deliberations—even if shortly before the verdict was rendered—does not mean that the jury did not reach a unanimous decision that the murders were premeditated before the verdict was rendered.[9] Regardless of speculation that some juror may have

---

9. The record indicates that the jury retired to begin deliberations at 4:30 p.m., that it continued deliberations after receiving the answer to the question about the verdict forms at 6:31 p.m., and that it returned its verdicts at 6:36 p.m. But there is no indication in the record as to what time the jury posed the question about the verdict forms. In accordance with the standard instructions, the jury was instructed that "it may take some time" for the court to talk with the attorneys before it answers any

- 22 -

concluded at some point during the guilt phase that only felony murder was proven beyond a reasonable doubt, the general verdict permitted the State to pursue the CCP aggravator. And as the trial court concluded, the jury's unanimous finding that CCP was proven beyond a reasonable doubt—after being instructed that "in order for this aggravating factor to apply, a heightened level of premeditation, demonstrated by a substantial period of reflection, is required"— demonstrates that the jury reflected on the evidence during the penalty phase and concluded that Wilson did indeed premeditate and plan the murders.

Although Wilson challenges the trial court's finding that the jury reflected on the matter during its penalty phase deliberations and concluded that premeditation was proven beyond a reasonable

---

question, and that the jury "may continue . . . deliberations while" it waits for the court's answer. Indeed, it is not uncommon for it to "take some time" for the attorneys to reassemble in the courtroom before a jury question is discussed. Nor is it unheard of for a jury to pose a question and then to continue deliberations, determine that an answer is not needed, and reach a verdict before the court has answered its question. It is possible that the jury here continued to deliberate after asking the question and reached unanimous decisions as to premeditation even before the court had the jury return to the courtroom for the reinstruction and new verdict forms.

doubt as an attempt by the trial court to "divine" "what was in the jurors' minds," the trial court reached this conclusion based on the jury's unanimous findings. In reality, Wilson is attempting to "divine" what was in the jurors' minds. He argues in his initial brief that between the time the jury posed its question about the verdict forms in the guilt phase and the time it rendered its guilty verdicts, "[i]t seems vanishingly unlikely . . . that the verdict after all was based on a unanimous finding that premeditation was shown." He argues in his reply brief that "[t]he jury's discussion of the mitigating effect of voluntary intoxication . . . may have been short-circuited by the State's emphasis on the CCP factor," and therefore "the State has failed to show" that the alleged error in submitting CCP to the jury was harmless as to the penalty phase. These arguments are purely speculative, unlike the trial court's conclusion, which was based on the jury's unanimous findings that CCP was proven beyond a reasonable doubt as to each murder.

## B. Methamphetamine Intoxication

Wilson next claims that the trial court erred in rejecting proposed mitigating evidence that Wilson was intoxicated by methamphetamine at the time of the murders. Methamphetamine

- 24 -

intoxication was not offered as a standalone mitigating circumstance, but Wilson appears to argue that whether he was intoxicated by methamphetamine at the time of the murders was relevant to three proposed mitigating circumstances: (1) the capital felony was committed while Wilson was under the influence of extreme mental or emotional disturbance; (2) the capacity of Wilson to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired; and (3) Wilson abused methamphetamine as an adult.

As to extreme mental or emotional disturbance, the court wrote:

> The Defendant argues that he was under the influence of methamphetamine. There is scant proof of this. All contemporaneous observations indicate he was not under the influence. The Defendant argues his memory of the events was impaired by the methamphetamine use. There is also scant proof of this. Instead, there is proof of a claim [of] selective memory. He remembers every detail of the morning, to include sexual relations with Cindy Guinan, the details of the drive to the convenience store and to the doctor, and the stay at the doctor's office. Yet he cannot recall the moments of the attack, or the actions he took immediately afterwards to clean himself and the weapons and hide the weapons. The Court listened to the audio recording of the three short interviews on the day of the attack. There is no indication of the influence of drugs or altered thinking.

Indeed, he wanted to make sure he "had his story straight" when he spoke to the detective.

As to the ability to conform his conduct to the requirements of law, the court wrote:

[T]here is little contemporaneous proof, other than the Defendant's self-serving claims, that he was actually under the influence of methamphetamine as he claimed. In the Defendant's *Spencer* hearing materials, there is evidence that Cindy Guin[a]n tested positive for amphetamines approximately 48 hours after the murders. This is consistent with his claim that he and Cindy were using methamphetamine contemporaneously with the murder[s]. However, there is no other corroboration. Indeed, the Court finds the greater quantum of evidence suggests that even if he had used methamphetamine, it was not having the deleterious effect his arguments suggest. Nor is there evidence of any of the other psychiatric diagnoses coming to the fore. He claims memory deficit, yet is able to describe, in what the Court found to be exquisite detail, everything around the murders. The Court finds the State's experts convincing when they assert that there is no scientific evidence supporting the kind of selective amnesia the Defendant claims. Therefore, the Court concludes that this statutory mitigating factor was not proven by a preponderance of the evidence. Consequently, the Court affords it NO WEIGHT.

As to the abuse of methamphetamine as an adult, the court made the following findings:

This is proven. There is testimony as well as to the serious deleterious effects of methamphetamine. However, as discussed above, the Court finds there is only the barest of proof suggesting the Defendant was

- 26 -

actually under the influence of methamphetamine at the time of the offense. The Court does accept the testimony regarding the deleterious effects, in general, of methamphetamine use. Therefore, as a general matter worthy of generalized consideration in mitigation the Court only affords this circumstance SLIGHT WEIGHT.

Wilson argues that the trial court erred in declining to accept that he was under the influence of methamphetamine at the time of the murders as demonstrated by: (1) unspecified "bizarre statements" made by Wilson during his confession; (2) the several occasions during his confession in which Wilson "le[ft] reality behind"; (3) unspecified "irrational accusations"; and (4) Dr. Skolly-Danziger's testimony that paranoia and delusions can accompany intoxication by methamphetamine.

Because Wilson has failed to identify the "bizarre statements" or "irrational accusations" to which he refers, these points are not sufficiently briefed to warrant relief. *See Heath v. State*, 3 So. 3d 1017, 1029 n.8 (Fla. 2009) ("Vague and conclusory allegations on appeal are insufficient to warrant relief."); *Murthy v. Missouri*, 603 U.S. 43, 67 n.7 (2024) ("[J]udges are not like pigs, hunting for truffles buried [in the record]." (second alteration in original) (quoting *Gross v. Cicero*, 619 F.3d 697, 702 (7th Cir. 2010))).

As for the "several occasions" during his confession when Wilson allegedly "leaves reality behind," Wilson specifies only one such occasion, which was when "he told the officers . . . that Cindy was 'so mischievous' she might well have silently conveyed to him her view that multiple members of her family ought to be murdered in their sleep." Assuming that this "silent conveyance" was a delusion that Wilson actually had, there is no evidence that it occurred at the time of the murders, especially considering Wilson's statement that the murders were preplanned. Nor is there any evidence that any such delusion resulted from methamphetamine use.

Dr. Skolly-Danziger testified that paranoia and delusions can accompany intoxication by methamphetamine, but she did not opine whether Wilson was intoxicated by methamphetamine at the time of the murders or whether any such methamphetamine intoxication would have caused Wilson to experience paranoia and delusions at the time of the murders.

Dr. Meadows said that it is obvious when someone is intoxicated by methamphetamine, but he found no evidence that Wilson was under the influence of methamphetamine at the time of

the murders. Dr. Meadows reviewed the recordings of Wilson's conversations with Detective Higginbotham on the day of the murders and determined that Wilson's behavior was inconsistent with methamphetamine intoxication. When Dr. Meadows evaluated Wilson, Wilson exhibited selective, nonsequential amnesia, which Dr. Meadows found indicative of malingering. Dr. Meadows also noted that the "higher functioning activities" in which Wilson engaged near the time of the murders and the fact that the murders were planned and premeditated were inconsistent with amphetamine-induced psychosis or amnesia.

Detective Higginbotham testified that in the three conversations he had with Wilson shortly after the bodies were discovered, he saw no indication that Wilson was at all impaired.

Mitigating evidence must be reasonably established by the greater weight of the evidence, but may be rejected if there is competent, substantial evidence to support its rejection. *E.g.,* *Coday v. State,* 946 So. 2d 988, 1001 (Fla. 2006). "As long as the court considered all of the evidence, the trial judge's determination of lack of mitigation will stand absent a palpable abuse of discretion." *Provenzano v. State,* 497 So. 2d 1177, 1184 (Fla. 1986).

The weight assigned to a mitigating circumstance is also within the trial court's discretion and will not be disturbed absent an abuse of discretion. *Kearse v. State*, 770 So. 2d 1119, 1133 (Fla. 2000).

Here, there was no objective evidence establishing by the greater weight of the evidence that Wilson was impaired at the time of the murders. No one who observed him close in time to the murders saw any indication that he was under the influence of any substance. The evidence to support this claim was limited to Wilson's own statement made during his confession and the fact that Cindy tested positive for amphetamines forty-eight hours after the murders, which the court found to be "consistent with [Wilson's] claim that he and Cindy were using methamphetamine contemporaneously with the murder[s]." The court found "no other corroboration" of Wilson's claim of intoxication at the time of the murders, and none appears in the record. Far more evidence suggested that Wilson was not intoxicated or that "even if he had used methamphetamine, it was not having the deleterious effect his arguments suggest."

To the extent that some evidence of methamphetamine intoxication was presented, the trial court was within its discretion

to determine that it was outweighed by the evidence demonstrating that Wilson was not intoxicated or impaired. And even if this limited evidence could be deemed to establish some level of intoxication or impairment at the time of the murders, the trial court still did not abuse its discretion in declining to find that any intoxication rose to the level of *extreme* mental or emotional disturbance; that Wilson was so intoxicated that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired; or that any intoxication at the time of the murders warranted more than slight weight being given to the fact that Wilson abused methamphetamine as an adult.

The trial court did not err in declining to find that Wilson was intoxicated by methamphetamine at the time of the murders or in ruling on the three proposed mitigating circumstances identified in this issue. Wilson is not entitled to relief.

### C. Victim Impact Evidence

Wilson alleges that the trial court erred in allowing victim impact testimony about past traumas to the victims' family. A trial court's decision to admit victim impact evidence is reviewed for an

abuse of discretion. *Miller v. State*, 379 So. 3d 1109, 1128 (Fla. 2024). This Court "will not find an abuse of discretion unless the trial court makes a ruling which no reasonable judge would agree with." *Id.* (quoting *Wells v. State*, 364 So. 3d 1005, 1013 (Fla.), *cert. denied*, 144 S. Ct. 385 (2023)).

Wilson appears to take issue with portions of the testimony of the victims' step-grandmother, Deborah Benson, discussing two tragedies that occurred within the victims' family in the three years before the murders in this case.[10] Wilson objected to the reading of these portions of Benson's prepared statement, but the trial court allowed them, noting that the family history was necessary to understand the context of the impact of the murders on the family. Wilson now argues that admission of these portions of Benson's statement constitutes reversible error because they were "offered,

10. Under this issue in his brief, Wilson does not indicate the testimony with which he takes issue except to say that "[t]he statement objected to in this case recounted tragic events that took place in the victims' family before the victims moved to the area." Thirty-two pages earlier in his brief, in his "Statement of the Case and Facts," Wilson refers to a "disputed statement" from Benson. It appears that the portions of Benson's statement quoted under the "Statement of the Case and Facts" is the statement that serves as the basis for this claim.

- 32 -

and admitted, to show how difficult it has been for the extended family to recover from the boys' violent deaths" and "only indirectly related to the offenses charged in this case, or to the victims of those offenses."

The portions of Benson's statement at issue explained the role that the earlier family tragedies played in the victims' move to Putnam County—where the murders occurred—less than two weeks before the crimes. Wilson concedes that "the disputed testimony in this case explained the extent of loss," but claims that "it did not tend to demonstrate the victims' uniqueness as individuals," and that victim impact testimony must do both.

Section 921.141(8), Florida Statutes (2022), provides that victim impact evidence "shall be designed to demonstrate the victim's uniqueness as an individual human being and the resultant loss to the community's members by the victim's death. Characterizations and opinions about the crime, the defendant, and the appropriate sentence shall not be permitted as a part of victim impact evidence." But the statute does not say that every word, sentence, or paragraph of a victim impact statement must cover both the victim's uniqueness and the resultant loss to the

community. Benson's statement, even the portions discussing the earlier tragedies, did both demonstrate the victims' uniqueness as individuals and the loss to the community's members as a result of their deaths. Moreover, the testimony was not unnecessarily emotional or inflammatory, did not mention Wilson or the facts of the murders, did not ask for specific sentences or punishments, and did not mention revenge or retribution. Thus, it cannot be said that the trial court abused its discretion in allowing the jury to hear the portions of Benson's statement referencing the earlier tragedies within the victims' family.

**D. Special Jury Instruction Regarding a Life Sentence**

Wilson argues that the trial court erred in declining to give a special jury instruction indicating that a life sentence virtually precludes a defendant's release from prison.

Before trial, Wilson filed a "Motion for Preliminary Jury Instruction ('Life' Means 'Life')." In that motion, Wilson requested that prospective jurors be instructed that if Wilson is found guilty of first-degree murder, the two possible sentences are life in prison or death and "that in the State of Florida a life sentence is in fact a life sentence." The motion was granted in part only to the extent that

the court agreed to read Florida Standard Jury Instruction 7.10 (Criminal) before voir dire. The trial court denied the motion as to the language requested, noting that preliminary instruction 7.10 already informs the jury that a life sentence means life imprisonment without the possibility of parole and that the instruction is repeated sufficient times within the standard instructions that the jury should be adequately instructed.[11] "A trial court's denial of special jury instructions is reviewed for abuse of discretion." *Snelgrove v. State*, 107 So. 3d 242, 255 (Fla. 2012).

In addition to the numerous times that the phrase "life without the possibility of parole" is mentioned in standard jury instructions 7.10 and 7.11 (which was read after penalty phase closing arguments), defense counsel advised the jurors no less than five times during voir dire and the penalty phase opening statement and closing argument that a life sentence in Florida means no chance of release or parole and that a person under a life sentence

_____

11. Florida Standard Jury Instruction 7.10 informs the jury three times that the penalty for first-degree murder is either life in prison without the possibility of parole or the death penalty.

will die in prison.  The State also announced that fact to the jurors during voir dire.

Wilson has not met his burden to demonstrate that the trial court abused its discretion in giving the standard instructions.  *See Stephens v. State*, 787 So. 2d 747, 755-56 (Fla. 2001).  "[S]tandard jury instructions are presumed correct and are preferred over special instructions."  *Id.* at 755.  "[T]he failure to give special jury instructions does not constitute error where the instructions given adequately address the applicable legal standards."  *Loyd v. State*, 379 So. 3d 1080, 1095 (Fla. 2023) (alteration in original) (quoting *Stephens*, 787 So. 2d at 755), *cert. denied*, 145 S. Ct. 188 (2024).  As the trial court noted, the standard instructions already repeatedly informed the jury that a life sentence in Florida means life imprisonment without the possibility of parole.  It would have been redundant to also advise the jury that "a life sentence is in fact a life sentence."  Wilson has not shown that he is entitled to relief on this claim.

### E.  "Reasonable" Qualifier

At the time of Wilson's trial, both the preliminary and final standard jury instructions for capital penalty phases stated that "a

mitigating circumstance may include any aspect of the defendant's character, background, or life or any circumstance of the offense that reasonably may indicate that the death penalty is not an appropriate sentence in this case." Fla. Std. Jury Instrs. (Crim.) 7.10, 7.11 (2022). Wilson filed a pretrial motion for a special jury instruction requesting the removal of the word "reasonably" from the instructions. Wilson asserted in his motion:

> 4. The "reasonably" qualifier may suggest to jurors that they must reject any proffered mitigation which appeals to emotion rather than reason. A majority of jurors might well argue that a holdout's concerns are not *reasonable*, and that for the group to consider them would violate the Court's instructions.

> 5. Requiring proof of mitigation to meet a "reasonableness" test presents a risk that deliberations regarding relevant mitigating evidence will be curtailed. Creation of that risk is both improper and unnecessary, and appears to have been unintentional.

The trial court denied the motion after hearing from the parties, and Wilson argues that the trial court erred in denying his request.

"A trial court's denial of special jury instructions is reviewed for abuse of discretion." *Bevel v. State*, 376 So. 3d 587, 596-97 (Fla. 2023) (quoting *Snelgrove*, 107 So. 3d at 255), *cert. denied*, 144 S. Ct. 2570 (2024). Here, the jury was properly instructed in

accordance with then-current standard instructions 7.10 and 7.11. The instructions were not confusing, contradictory, or misleading. Nothing about the use of the word "reasonably" in the instructions suggested that jurors must reject any proffered mitigation that appeals to emotion. The instructions clearly stated that the jury was entitled to consider *any* mitigating circumstances, which can be "anything that supports a sentence of life imprisonment" or "which might indicate that the death penalty is not appropriate." The jury was also instructed that "[t]he consideration of a mitigating circumstance does not require unanimity by the jury." Thus, Wilson's arguments about a holdout juror versus a majority and his concern that the word "reasonably" might have led to deliberations about relevant mitigating evidence being curtailed are unfounded. The trial court did not abuse its discretion in reading standard instructions 7.10 and 7.11 without removing the word "reasonably."

### F. Denial of a "Mercy" Instruction

Before trial, Wilson filed a "Motion for Special Penalty Phase Jury Instruction re: Mercy." Wilson argues that the denial of this motion was erroneous, but this Court has repeatedly determined that Florida Standard Jury Instruction 7.11 (Criminal) adequately

informs jurors of the applicable legal standard. *E.g.*, *Bevel*, 376 So. 3d at 597; *Woodbury v. State*, 320 So. 3d 631, 656 (Fla. 2021); *Bush v. State*, 295 So. 3d 179, 210 (Fla. 2020). We have even referred to the relevant provision of Standard Instruction 7.11—which states that "the law neither compels nor requires you to determine that the defendant should be sentenced to death"—as the "mercy instruction." *See Woodbury*, 320 So. 3d at 656 (quoting *Reynolds v. State*, 251 So. 3d 811, 816 n.5 (Fla. 2018)). "Thus, the court *did* read an instruction on mercy, and although [the defendant] might have preferred the wording of his proposed instruction, Standard Jury Instruction 7.11 is not ambiguous when it comes to addressing the jurors' options." *Id.* Wilson is not entitled to relief on this claim.

### G. Failure to Allow Consideration of Sympathy

The trial court also denied Wilson's pretrial motion asking (a) that the State be precluded from arguing that sympathy is an improper jury consideration and (b) that any statement that sympathy for Wilson is an improper consideration be omitted from the jury instructions. Wilson argued that "[a]ny argument by [the] prosecution against sympathy for the defendant is an improper

consideration [that] would fail to comport with the principle announced in *Lockett v. Ohio*, 438 U.S. 586 (1978), i.e., that the sentencer in a capital case may not be precluded from giving effect to all mitigating circumstances."

Wilson argues that the trial court erred in denying his motion and that the instruction given to the jury that its "decision must not be based upon the fact that you feel sorry for anyone or are angry at anyone" violated the Eighth Amendment. The trial court and Wilson both used the "sorry for" language in the standard instruction interchangeably with "sympathy," and Wilson confirms in his reply brief that he was actually requesting to exclude the "sorry for" language from the jury instructions rather than any "sympathy" language.

The Supreme Court has already held in *California v. Brown*, 479 U.S. 538 (1987), that it does not offend the Eighth Amendment to instruct a jury to reach a verdict based on the evidence rather than emotion, which would include feeling "sorry for" an individual. As *Brown* concludes, such an instruction "serves the useful purpose of confining the jury's imposition of the death sentence by

cautioning it against reliance on extraneous emotional factors." *Id.* at 543. Thus, Wilson is not entitled to relief.

## H. *Lawrence v. State*

Wilson next argues that this Court wrongly decided *Lawrence v. State*, 308 So. 3d 544, 548-52 (Fla. 2020), in which we receded from the judge-made requirement to review the comparative proportionality of death sentences as contrary to the conformity clause of article I, section 17 of the Florida Constitution. We have repeatedly declined invitations to reconsider our decision in *Lawrence* and have reaffirmed that comparative proportionality review is not mandated by the Eighth Amendment. *See Johnson v. State*, 397 So. 3d 626, 643 (Fla. 2024); *Loyd*, 379 So. 3d at 1097-98; *Wells*, 364 So. 3d at 1015; *Gordon v. State*, 350 So. 3d 25, 36 (Fla. 2022); *Bevel*, 376 So. 3d at 597. Wilson has not offered any compelling reason to change course now.[12]

---

12. Wilson also asks us to recede from our decision in *Cruz v. State*, 372 So. 3d 1237, 1245 (Fla. 2023), *cert. denied*, 144 S. Ct. 1016 (2024), in which we held that "[a]s an integrated part of comparative proportionality review, relative culpability review was rendered obsolete by the *Lawrence* decision." That case is completely inapposite here because Wilson did not have a codefendant, so relative culpability review would not be a factor here even if it were not obsolete.

### I. Class of Persons Eligible for the Death Penalty

Wilson argues that Florida's death penalty scheme fails to narrow the class of persons eligible for the death penalty to comport with the Eighth Amendment. As Wilson acknowledges, this Court has repeatedly rejected the argument that Florida's death penalty scheme fails to sufficiently narrow the class of murderers eligible for the death penalty and thus violates the Eighth Amendment. *See Joseph v. State*, 336 So. 3d 218, 227 n.5 (Fla. 2022); *Cruz v. State*, 320 So. 3d 695, 730 (Fla. 2021); *Colley v. State*, 310 So. 3d 2, 15-16 (Fla. 2020); *Bush*, 295 So. 3d at 214; *Wells*, 364 So. 3d at 1015; *Johnson v. State*, 969 So. 2d 938, 961 (Fla. 2007); *Miller v. State*, 926 So. 2d 1243, 1260 (Fla. 2006). Wilson presents no new or compelling argument that would require this Court to revisit its prior decisions.

### J. Death Qualifying the Jury

As Wilson acknowledges, the argument that death qualifying a jury is unconstitutional was recently raised and rejected in *Loyd*, 379 So. 3d at 1095-96. *See Initial Brief of Appellant* at 96-100, *Loyd*, 379 So. 2d 1080 (No. SC2022-0378). In *Loyd*, we wrote:

> Loyd argues that death qualifying the jury skews it towards guilt and violates the Sixth Amendment to the United States Constitution. Loyd concedes that this Court has rejected this claim before, yet raises it to preserve it for federal review. We have indeed repeatedly rejected this claim. *See Wade v. State*, 41 So. 3d 857, 873 (Fla. 2010); *Chamberlain v. State*, 881 So. 2d 1087, 1096 (Fla. 2004); *San Martin v. State*, 717 So. 2d 462, 467 (Fla. 1998); *San Martin v. State*, 705 So. 2d 1337, 1343 (Fla. 1997). So too has the United States Supreme Court. *See Lockhart v. McCree*, 476 U.S. 162, 173 (1986) ("[T]he Constitution does not prohibit the States from 'death qualifying' juries in capital cases."). We again deny this claim.

*Loyd*, 379 So. 3d at 1095-96 (alteration in original).

Nothing has changed since *Loyd* that would warrant consideration of a different outcome here. Wilson is not entitled to relief.

## K. Unconscionability of the Death Penalty

Wilson also acknowledges that his arguments that the death penalty is unconscionable were also recently raised and rejected in *Loyd*, 379 So. 3d at 1096-97. *See Initial Brief of Appellant* at 101-07, *Loyd*, 379 So. 2d 1080 (No. SC2022-0378). Concerning the argument that the death penalty no longer comports with society's evolving standard of decency, we wrote in *Loyd*:

> Loyd's argument (1), that the death sentence is now inconsistent with our society's standard of decency, is

similarly unavailing. Again, Loyd relies on Justice Breyer's dissent in *Glossip* [*v. Gross*, 576 U.S. 863 (2015)]. The Court's opinion in *Glossip*, however, upheld the constitutionality of the death penalty. 576 U.S. at 867 (majority opinion); *see also id.* at 869 (recognizing that it is settled law that capital punishment is constitutional). Loyd argues that because other states have outlawed capital punishment, it is now unconstitutional. We addressed a similar argument in *Long v. State*, 271 So. 3d 938 (Fla. 2019). Responding to an argument that Florida's three-drug method of execution was unconstitutional because other states have adopted a one-drug protocol, this Court concluded that "Florida's current protocol does not violate the constitution simply because other states have altered their methods of lethal injection." *Id.* at 945 (quoting *Muhammad v. State*, 132 So. 3d 176, 196-97 (Fla. 2013)). In a similar vein, the death sentence is not unconstitutional just because other states have chosen to abolish it. At bottom, the Constitution itself contemplates, in the Fifth and Fourteenth Amendments, that the government may take a life if the government affords the person due process of law. Loyd falls well short of the hurdle it takes to prove that something the Constitution permits is at the same time unconstitutional.

*Loyd*, 379 So. 3d at 1096-97.

As to the argument that the death penalty is unreliable, we wrote:

We also can quickly dispose of argument (2). The State correctly notes that exonerations undermine not the sentence but the conviction. Responding directly to Justice Breyer's dissent in *Glossip*, Justice Scalia characterized this argument as internally contradictory and "gobbledy-gook." *Glossip*, 576 U.S. at 895 (Scalia, J.,

concurring).  We too find it hard to understand how alleged issues in the guilt phase render a certain punishment unconstitutional.  The same logic would make life imprisonment unconstitutional if enough people serving life are exonerated.  This argument has no merit.

*Id.* at 1096.

As to the argument that the death penalty is arbitrary in its application, we wrote:

Turning to argument (3), we are persuaded by Justice Thomas's *Glossip* concurrence, which adequately explains why this argument is meritless.  Justice Thomas stated that relying on the studies that conclude that locality plays too heavily a role in death sentencing "to determine the constitutionality of the death penalty fails to respect the values implicit in the Constitution's allocation of decisionmaking in this context."  *Id.* at 901 (Thomas, J. concurring).  Indeed, the two provisions in the Constitution memorializing that crimes are tried by a local jury "ensure that capital defendants are given the option to be sentenced by a jury of their peers who, collectively, are better situated to make the moral judgment between life and death than are the products of [these studies]."  *Id.* at 902-03.  Additionally, "the results of these studies are inherently unreliable because they purport to control for egregiousness by quantifying moral depravity in a process that is itself arbitrary" and dehumanizing.  *Id.* at 903.  For these reasons, Loyd's argument (3) is unconvincing.

*Id.* (alteration in original).

As to the argument that unconscionably long delays undermine the death penalty's penological purpose, we wrote:

> [W]e have recently rejected argument (4). In *Dillbeck v. State*, 357 So. 3d 94, 103 (Fla.), *cert. denied*, 143 S. Ct. 856 (2023), we emphasized our longstanding precedent that these claims "are 'facially invalid,' including when the defendant's stay on death row exceeded 30 years." Loyd has not persuaded us here to change our position on this argument.

*Id.*

Wilson has not directed us to anything that has occurred since *Loyd* was decided that would make any of these arguments more convincing now. Wilson is not entitled to relief on this claim.

## L. Sufficiency of the Evidence

Although Wilson does not challenge the sufficiency of the evidence to sustain his convictions for the first-degree murders, this Court independently reviews the record in death penalty cases to determine whether competent, substantial evidence supports the conviction. Fla. R. App. P. 9.142(a)(5) ("On direct appeal in death penalty cases, whether or not insufficiency of the evidence is an issue presented for review, the court must review the issue and, if necessary, remand for the appropriate relief."). Our duty on appeal is "to review the record in the light most favorable to the prevailing theory and to sustain that theory if it is supported by competent[,]

substantial evidence." *Orme v. State*, 677 So. 2d 258, 262 (Fla. 1996).

Wilson confessed to killing the boys. He admitted entering their home and beginning the attack while they were sleeping, using his hammer to hit each of them multiple times, and cutting their throats with his fillet knife. Wilson admitted being "cold and emotionless" while he was committing the murders. The jury was instructed on theories of both premeditated murder and felony murder and returned a general verdict of guilty of first-degree murder. A "general guilty verdict rendered by a jury instructed on both first-degree murder alternatives may be upheld on appeal where the evidence is sufficient to establish either felony murder or premeditation." *Crain v. State*, 894 So. 2d 59, 73 (Fla. 2004). The evidence in this case is sufficient to sustain both convictions on both theories.

To establish first-degree premeditated murder, the State was required to prove the following elements: (1) the victim is dead; (2) the death was caused by the criminal act of Wilson; and (3) there was a premeditated killing of the victim. The medical examiner's testimony and Wilson's confession were sufficient to sustain the

first two elements. As explained above, there was sufficient evidence of the heightened premeditation necessary to support the jury and judge's finding that the CCP aggravator was proven beyond a reasonable doubt; thus, there is competent, substantial evidence of premeditation sufficient to sustain convictions for first-degree premeditated murder.

To prove first-degree felony murder, the State was required to prove the following three elements: (1) the victim is dead; (2) while engaged in the commission or attempted commission of a burglary, Wilson caused the death of the victim; and (3) Wilson was the person who actually killed the victim. To prove the crime of burglary for purposes of felony murder, the State was required to prove: (1) Wilson had permission or consent to enter a structure owned by or in the possession of Chad and Sarah Baker; and (2) Wilson, after entering the structure, remained therein with the intent to commit or attempt to commit an aggravated assault or aggravated battery or manslaughter or second-degree murder or first-degree premeditated murder inside the structure. Sarah Baker's testimony that Wilson had permission to access the home and Wilson's admission that he accessed the home that morning

with a fillet knife and a hammer to kill the boys provide competent, substantial evidence to sustain felony murder convictions.

### III. CONCLUSION

Having reviewed each of Wilson's claims, we affirm the judgments of conviction and sentences, including the sentences of death.

It is so ordered.

MUÑIZ, C.J., and CANADY, COURIEL, GROSSHANS, FRANCIS, and SASSO, JJ., concur.
LABARGA, J., concurs in result with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

LABARGA, J., concurring in result.

I fully concur in the decision to affirm Wilson's convictions in this case. I concur in result only to reaffirm my dissent in *Lawrence v. State*, 308 So. 3d 544 (Fla. 2020) (abandoning this Court's decades-long practice of comparative proportionality review in the direct appeals of sentences of death).

An Appeal from the Circuit Court in and for Putnam County,
    Howard O. McGillin, Jr., Judge
    Case No. 542020CF001021CFAXMX

Matthew J. Metz, Public Defender, and Nancy Ryan, Assistant Public Defender, Seventh Judicial Circuit, Daytona Beach, Florida,

for Appellant

James Uthmeier, Attorney General, Tallahassee, Florida, and Naomi Nichols, Assistant Attorney General, Daytona Beach, Florida,

for Appellee